IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MARCELLA C. DE HERRERA,

      Plaintiff,

vs.                                        No.  02cv1493 DJS

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

## MEMORANDUM OPINION

This matter is before the Court on Plaintiff's (De Herrera's) Motion to Reverse and

Remand for a Rehearing **[Doc. No. 11]**, filed May 30, 2003, and fully briefed on July 24, 2003.

The Commissioner of Social Security issued a final decision denying De Herrera's claim for

disability insurance benefits.  Having considered the arguments, pleadings, administrative record,

relevant law, and being otherwise fully informed, the Court finds the motion to reverse is not well

taken and will be DENIED.

### I.  Factual and Procedural Background

De Herrera, now 51 years old, filed her application for disability insurance benefits on

April 20, 2001, alleging disability since June 15, 1998, due to diabetes mellitus.  Tr. 86, 97.  De

Herrera has a ninth grade education and a GED.  Her past relevant work was as an assembler.  On

March 14, 2002, the Commissioner's Administrative Law Judge (ALJ) denied benefits, finding

that De Herrera's impairment was severe but did not meet or equal in severity any of the disorders

described in the Listing of Impairments, Subpart P, Appendix 1.  Tr. 17.  Specifically, the ALJ

considered Listing 9.08 (Diabetes Mellitus) and found De Herrera's "diabetes had not resulted in neuropathy, acidosis, amputation, or retinitis as required by Listing 9.08." *Id.*  The ALJ also found there was no evidence of end-organ damage.  *Id.*  The ALJ further found De Herrera retained the residual functional capacity (RFC) "for a substantially full range of sedentary work not involving exposure to extreme temperatures."  Tr. 18.  As to her credibility, the ALJ found De Herrera's "complaints and allegations [were] not fully supported by the medical record (20 C.F.R. § 404,1529)." *Id.*  De Herrera filed a Request for Review of the decision by the Appeals Council.  On October 23, 2002, the Appeals Council denied De Herrera's request for review of the ALJ's decision.  Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes.  De Herrera seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291

(10th Cir. 1989).  "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).  Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met.  *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity.  *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)).  The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f).  The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled.  *Thompson*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20

C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to

the Commissioner to show the claimant is able to perform other substantial gainful activity

considering her residual functional capacity, age, education, and prior work experience. *Id.*

In support of her motion to reverse, De Herrera makes the following arguments: (1) the

ALJ erred at step four of the sequential evaluation process when he concluded that she could

return to her past relevant work; and (2) the ALJ erroneously concluded that she was non-

compliant with medical treatment.  The Court will address the second issue first.

**A.  Non-Compliance with Medical Treatment**

Failure to follow a prescribed course of treatment, without good reason, is grounds for

denial of disability benefits, 20 C.F.R. 404.1530(b), and can be the basis for discrediting

claimant's subjective complaints. *See Diaz v. Secretary of Health & Human Servs.,* 898 F.2d

774, 777 (10th Cir. 1990).  This circuit  has set out four requirements that must be met before a

claimant's failure to undertake treatment will preclude the recovery of disability benefits: "(1) the

treatment at issue should be expected to restore the claimant's ability to work; (2) the treatment

must have been prescribed; (3) the treatment must have been refused;  (4) the refusal must have

been without justifiable excuse." *Teter v. Heckler*, 775 F.2d 1104, 1107 (10th Cir. 1985).

De Herrera contends the ALJ "used the issue of non-compliance to render an unfavorable

Decision in this case."  Pl.'s Mem. in Supp. of Mot. to Reverse and Remand at 7.  De Herrera

also claims "the ALJ used an improper legal standard in determining noncompliance in making his

decision." *Id.* at 8.  Therefore, De Herrera argues this case "should be reversed and remanded

with instructions that the Commissioner develop this issue." *Id.*  De Herrera maintains there are

"only two medical records in the exhibit file which even discuss non-compliance." *Id.* The record belies De Herrera's contention. The record indicates the following:

## 1.  Felix Cerna, M.D./Lovelace

On April 22, 1998, De Herrera was seen by Dr. Felix Cerna, an internist at Lovelace in Albuquerque. Tr. 168. De Herrera reported she was having problems with her vision for the past two weeks. She also reported her blood glucose was not under control and had been 260 the previous day. De Herrera reported blood glucose levels as high as 500 and as low as 180 for the past month. Dr. Cerna assessed De Herrera's visual problems as secondary to fluctuating blood glucose levels.

On June 15, 1998, De Herrera returned for a follow-up visit with Dr. Cerna. Tr. 163-164. De Herrera did not have any complaints and claimed she had been compliant with her medication. Tr. 163. Dr. Cerna noted De Herrera was obese with no weight change. The examination was unremarkable. Dr. Cerna noted De Herrera had previously had a glycosylated hemoglobin[1] of 10.4 (Tr. 167) on June 4, 1998, which was abnormally high. Tr. 164. Routine measurements of glycosylated hemoglobin (hemoglobin A1c) in the care of patients with diabetes mellitus are used in assessing glycemic control. Dr. Cerna assessed De Herrera as (1) Noncompliance, this is improving; (2) Diabetes, dip sticks at home have ranged from 150 to 250; (3) Hypothryroidism– will check another TSH today; (4) Obesity, no change. The patient is not following diet and exercise; (5) Hyperlipidemia– will treat after diabetes and hypertension have been well controlled;

---

[1]  Most physicians periodically determine glycosylated hemoglobin (Hb A1c) to estimate plasma glucose control during the preceding one to three months. In most laboratories, the normal Hb A1c is bout 6%; in poorly controlled diabetes, the level ranges from 9 to 12%. *The Merck Manual* 170 (17th ed. 1999).

(6) Degenerative joint disease with low back pain, the patient having an exacerbation; and (7) Health maintenance– she has a mammogram scheduled for 07-01.  A pap smear will be done later this year.  Under "Plan," Dr. Cerna noted: "Increase NPH insulin to 10 units subq bid.  TSH today, lumbosacral spine series today.  Return to clinic in four weeks.  Her hypertension is well controlled at the present time."  *Id.*  The lumbosacral spine series revealed no acute abnormalities.  Tr. 165.  The TSH was elevated.  Tr. 166.  The hemoglobin A1c was 8.6 (normal values referenced in the laboratory report were 4.5-6.1).  Tr. 167.

On July 28, 1999, De Herrera returned for her follow-up with Dr. Cerna.  Tr. 157-158.  De Herrera had no complaints that day.  At that time, De Herrera reported "being compliant with her medication <u>but not with her diet</u>."  Tr. 157.  Dr. Cerna noted De Herrera weighed 149 pounds.  Dr. Cerna also noted "Glucose testing at home reveals values between 130 to 200, according to the patient."  *Id.*  Dr. Cerna assessed De Herrera as (1) <u>Noncompliance</u>, improving; (2) Diabetes, slightly improved since her last visit; (3) Hypothyroidism, continues to improve, according to TSH; (4) <u>Obesity, no change</u>.  <u>Patient not following diet and exercise</u>; (5) Hyperlipidemia.  will repeat lipid panel today and begin treatment if it remains uncontrolled once the diabetes and hypothyroidism have been controlled; (6) DJD (degenerative joint disease) with chronic low back pain, stable; (7) The rest of her health maintenance is up to date; (8) Chronic lichen simplex dermatitis.  Tr. 157-158.  Under Plan, Dr. Cerna noted: <u>Patient was counseled again about diet and exercise.</u>  We will get a lipid panel, glycohemoglobin, and TSH today.   Patient will return to see me in two month, or earlier if needed.  I will call her with the results of the blood tests and make necessary adjustments.  Tr. 158.  The results of the glycosylate HGB was 13.2 (normal values referenced in the laboratory report are 4.7-8.1).  Tr. 161.

On August 10, 1999, Dr. Cerna evaluated De Herrera for "multiple problems."  Tr. 136-137.  Dr. Cerna noted that he had not seen De Herrera since July 28, 1998.  <u>De Herrera reported she was not taking any medications</u>.  "Her only complaint is a feeling of fatigue."  *Id.*  Her blood glucose level done at the office was 436 (normal fasting glucose level is less than 110 mg/dl).  The blood glucose level reported by Lovelace Laboratory on August 11, 1999, was 351.  Tr. 141.  Dr. Cerna referred to his notes of July 28, 1999 for a list of De Herrera's problems.  Dr. Cerna also noted that De Herrera's blood glucose level was 317 on February 6, 1999.  Tr. 136, 154.  A second blood glucose level done on February 10, 1999, at Lovelace Laboratories was 341.  Tr. 147.  Dr. Cerna ordered a hemoglobin A1c and refilled De Herrera's medications.  Tr. 137.  De Herrera's hemoglobin A1c was 13.7 (normal values referenced in the laboratory report are 4.7-6.4).  Tr. 138.

On November 7, 1999, Dr. Jan Goldthwait, an internist at Lovelace in Albuquerque, evaluated De Herrera for incipient DK (diabetic ketoacidosis) and cellulitis of her left foot.  Tr. 121-122.  Dr. Goldthwait admitted De Herrera to the hospital.  Dr. Goldthwait noted the following:

> HISTORY OF PRESENT ILLNESS:  Mrs. Deherrera is a pleasant middle age female with a <u>history of noncompliance</u> who seven days prior to admission was pushing her car which ran out of gas.  She unfortunately had a tire run over part of her left foot.  She did present to the Emergency Room that day at which time [a] foot x-ray was negative for fracture, and was given crutches and pain medication.  She has not taken care of the injury and walked on the foot.  She apparently developed broken skin and redness for which she represented to the Emergency Room yesterday 11-06-99.  Her <u>glucose at that time was 427</u> with a bicarbonate of 15, and she was placed on CD or on an insulin drip with fluids.  Unfortunately, over the ensuing 24 hours, her bicarbonate was never higher than 18 at rest.  Blood draw (sic) at 4:00 p.m. today, <u>glucose 194</u> with a bicarbonate 15, potassium 4.3.  Serum ketones and lactate were negative.  She was admitted for continuous management of her low bicarbonate and treatment for her cellulitis.  She denies any fever, chills, night sweats.  She denies any G.I. symptomatology, nausea, vomiting, diarrhea, or melena.

> Generally, she has been feeling relatively well and has not seen Doctor Cerna since last August.  She does state she has been compliant with her insulin, glipizide and glucophage.

Tr. 121 (emphasis added).  Dr. Goldthwait noted that on admission De Herrera had a glucose level of 427 with a bicarbonate of 15 and potassium of 4.4.  Tr. 122.  By 4:00 p.m. the following day, De Herrera's glucose was down to 194.  *Id.*  Dr. Goldthwait diagnosed De Herrera with incipient DK (diabetic ketoacidosis) with low bicarbonate. Dr. Goldthwait decided to admit De Herrera "for further management <u>given her history of non-compliance</u> and her cellulitis.  Dr. Goldthwait ordered a consultation with a podiatrist.  Tr. 123.

On November 7, 1999, Robert Parks, D.P.M. (podiatrist) evaluated De Herrera.  Tr. 119-120.  Dr. Parks noted De Herrera admitted that she did not use the prescribed crutches and had been quite active since the injury which had occurred six days before.  Tr. 119.  Dr. Parks concurred with Dr. Goldthwait's recommendation that De Herrera be admitted for IV antibiotic therapy.  *Id.*

On November 9, 1999, Dr. Cerna examined  De Herrera while she was hospitalized.  Tr. 117-118.  Dr. Cerna discharged De Herrera and noted:

> Briefly, the patient was admitted with a cellulitis of her left leg following trauma.  The patient had a small abrasion on the dorsum of the foot with surrounding cellulitis.  she was started on Cefotaxime and Flagyl.  Initially the Flagyl was then discontinued because [of] nausea secondary to the medication.  The area of cellulitis was much improved on the day of discharge.  Local wound care in the form of wet gauze dressing was also instituted.  The patient also had <u>poorly controlled diabetes</u> at the time of admission with mild pauses.  <u>This responded to IV fluids and insulin therapy and she was at baseline at the time of discharge.</u>
>
> Principle Diagnosis Explaining Admission:  Cellulitis of the left leg and <u>poorly controlled diabetes</u>.  The rest of her medical problems were not a factor during this admission.

Tr. 117 (emphasis added).

Laboratory results of November 9, 1999, indicate De Herrera's glucose level (not fasting) was down to 117 (normal fasting glucose level is less than 110mg/dl).  Tr. 124.  On November 7, 1999, De Herrera's glucose level had been 247.  Tr. 126.  On November 6, 1999, De Herrera's glucose level at approximately 6:30 p.m. had been 427 and at approximately 9:00 p.m. it had been 304.  Tr. 130.  Once De Herrera was on insulin her glucose level quickly went down.

On November 16, 1999, De Herrera returned to see Dr. Cerna for her follow-up.  Tr. 134. At that time, she had no complaints.  Dr. Cerna noted that De Herrera's diabetes was better with her morning glucose running between 150 and 200, which "[was] better for her."  *Id.*  De Herrera's cellulitis had also resolved.  Dr. Cerna  directed De Herrera to return to see him "in two to three weeks with a hemoglobin A1c."  *Id.*

## 2.  Sam Kassicieh, D.O.

On September 21, 2000, De Herrera begin seeing Dr. Sam Kassicieh, an osteopath. Tr. 171.  Dr. Kassicieh noted a blood glucose level of 313 and increased her medications.  Other than to note De Herrera's weight of 136 pounds there is no indication in Dr. Kassicieh's brief notes that he performed a physical examination or took a history.

On October 20, 2000, De Herrera saw Dr. Kassicieh for hot flashes and reported she had not had menstrual periods for two months.  Tr. 171.  That is the extent of Dr. Kassicieh's notes for that visit.  On December 4, 2000, Dr. Kassicieh appears to have increased De Herrera's insulin with no other notations made.  On December 18, 2000, Dr. Kassicieh increased De Herrera's insulin once more.  Again, Dr. Kassicieh made no other notations.  On March 21, 2001, Dr. Kassicieh noted a blood glucose of 388, the UA (urinalysis) indicated a 4+ sugar and + for nitrates.  Dr. Kassicieh assessed De Herrera as "DM– uncontrolled."  Dr. Kassicieh increased De

Herrera's insulin once more.  On April 4, 2001, Dr. Kassicieh noted an elevated blood glucose of

408 that morning.  Again, Dr. Kassicieh increased De Herrera's insulin.  On April 11, 2001, Dr.

Kassicieh noted a blood glucose of 300 and increased the insulin once more.  Tr. 170.  On April

27, 2001, Dr. Kassicieh noted the following lab results: triglycerides 1024, cholesterol 289, Hgb

A1c 12.3 (normal values referenced in the laboratory report are 4.4-5.8) (Tr. 172).  Dr. Kassicieh

also noted De Herrera had  blood glucose levels of 291, 263, and "today 125."  Dr. Kassicieh

assessed De Herrera as (1) DM (diabetes mellitus); (2) hyperlipidemia; and (3) hypothyroidism.

Dr. Kassicieh made some changes to De Herrera's diabetic medications and added Zocar 40 mg

(a lipid-lowering agent).

### 3.  Dr. G.T. Davis

On June 26, 2001, Dr. G.T. Davis, performed a consultative evaluation.  Tr. 175-183.  Dr.

Davis noted he had received and reviewed De Herrera's medical records from Lovelace but not

from Dr. Kassicieh.  Tr. 176.  Dr. Davis performed a physical examination, noting:

> Physical Examination:  The lady seemed to be alert and oriented.  Height 57 ½ inches,
> weight 133 pounds, pulse 100, and blood pressure 128/72.  Uncorrected far vision, 20/50
> on the right and 20/70 on the left, near vision, 20/70 both eyes.  Hearing and speech were
> intact.  The gait was normal and balance good.  She will take a few steps on her toes and
> heels and squat down about halfway.  Limb measurements in the upper and lower
> extremities were symmetrical without atrophy.  Funduscopic examination did not show any
> gross hemorrhages or exudates.  She had good mobility of the neck, mid back, and low
> back without complaints of pain.  There was no spasm or deformity in the spinal region,
> and seated straight leg raising was negative.
>
> Examination of upper extremities showed good motion of the shoulders, elbows, wrists,
> and digits.  Vibratory sensation was intact.  She reported discomfort with squeezing of the
> hand and finger joints, but there was no significant finger deformity or swelling as she
> could take her ring off and on without difficulty, although she said sometimes her hands
> are swollen.
>
> Examination of the lower extremities showed good motion of the hips, knees, and ankles.
> She had some excoriated lesions over the front of her shins and on the left lateral calf
> where she has been scratching herself.  There is a scar over the top of her left foot from a

prior infection in 1999.  However, proprioception, vibratory sensation, and light touch sensation were intact in both feet, and deep tendon reflexes at the knees and ankles were 1+.

Tr.  176.  Dr. Davis summarized his findings:

> SUMMARY:  The examinee, apparently, has poorly controlled diabetes.  Records form Lovelace indicate that she was not compliant with her medications or other regimen for her diabetes.  Medically, I do not know of any reason why, if she was taking her medications appropriately and her diabetes was being managed carefully, she would not have essentially more and more blood sugars.  At least at this point, she doesn't seem to have any significant objective sequela of diabetes demonstrable on examination; so, if she could get control of her situation, the risk of on going problems would be substantially diminished.  She does have some excessive scratching that she does on her legs as described.  She has had tingling in her toes for a couple of weeks, which could be an indication of early neuropathy.
>
> From the work perspective, she probably should avoid extremes in temperature like cold, but I don't see any reason that she couldn't be more active if she could get her diabetes under control.  Diabetes in and of itself is not a contraindication to work or performance of activities of daily living.  She needs to do what she can to eliminate any complication.

Tr. 177.

As reflected by the record, De Herrera's treating physicians documented she was noncompliant with her treatment.  She admitted she did not exercise and had problems following a diet and consistently had elevated HgbA1c's.  Significantly, at the administrative hearing, De Herrera testified she had not taken her diabetes seriously and had not started taking her medication properly until about "year and a half ago."  Tr. 48.  Additionally, the ALJ's decision is clear that, although the ALJ considered De Herrera's noncompliance as the basis for discrediting her subjective complaints, which was proper, it was not the grounds he relied upon for denying her disability benefits.   The ALJ also considered the medical evidence, Dr. Davis' consultative evaluation, and De Herrera's activities of daily living.  Tr. 17-19.

**B.  Step Four of the Sequential Evaluation Process**

At step four of the sequential evaluation process, a claimant bears the burden of proving that her medical impairments prevent her from performing work that she has performed in the past.  *See Williams v. Bowen*, 844 F.2d 748, 751 & n.2 (10th Cir. 1988 ).  However, in order to make the ultimate finding that a claimant is not disabled at step four, the ALJ is required by the agency's rulings to make specific and detailed predicate findings concerning the claimant's residual functional capacity, the physical and mental demands of the claimant's past jobs, and how these demands mesh with the claimant's particular exertional and nonexertional limitations.  See SSR 96-8p, 1996 WL 374184, SSR 82-62, at *4, *see also Winfrey v. Chater*, 92 F.3d 1017, 1023-25 (10th Cir. 1996).

De Herrera contends the ALJ's conclusion that she has the ability to perform a full range of sedentary work and thus capable of returning to her past relevant work is not supported by the record.  The Court disagrees.  First of all, "[f]or cases at the Administrative Law Judge hearing . . . level, the responsibility for deciding [a claimant's] residual functional capacity rests with the Administrative Law Judge."  20 C.F.R. § 404.1546.   The ALJ concluded De Herrera retained the RFC for a substantial range of sedentary work not involving exposure to extreme temperatures. Tr. 18-19.  In arriving at this RFC, the ALJ considered De Herrera's medical records from Lovelace, Dr. Kassicieh's medical records and Dr. Davis' evaluation.  The ALJ also considered De Herrera's testimony.  Moreover, De Herrera's physicians and the agency consultant did not impose any restrictions on De Herrera  in terms of her ability to work.  Thus, the Court finds that substantial evidence supports the ALJ's RFC.

12

Next, De Herrera contends the ALJ failed to follow the *Winfrey* step-four analysis.  In this case, the ALJ consulted a vocational expert (VE).  "An 'ALJ may rely on information supplied by the VE at step four.'"  *Doyal v. Barnhart,* 331 F.3d 758, 761 (10th Cir. 2003)(citing *Winfrey*, 92 F.3d at 1025).  In his decision, the ALJ referred to the VE's testimony that, based upon De Herrera's RFC, she could return to her past relevant work of assembler as she performed it.  Tr. 18.  The VE testified she had reviewed the vocational record in this case and had listened to the testimony.  Tr. 50.  The VE also asked De Herrera whether she had been a group leader or supervisor during the time she performed assembly work.  *Id.*  The VE then testified De Herrera could perform her past relevant work as an assembler based on the ALJ's RFC.  Tr. 51.  The VE testified his testimony was consistent with the Occupational Title.  *Id.*  The VE also testified his opinion was "based on – well, her description of [her] position, in her vocational report, she changed positions and also my experience with the type of assembly work, that she had."  Tr. 52. Although the ALJ could have been more detailed in this decision in terms of his step four analysis, "the form of words should not obscure the substance of what the ALJ actually did."  *See Doyal,* 331 F.3d at 761.  Accordingly, the Court finds that the ALJ's findings were adequate to satisfy the step four requirements articulated in *Winfrey*.  The ALJ applied correct legal standards and his decision is supported by substantial evidence.

A judgment in accordance with this Memorandum Opinion will be entered.

_____
**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**